2026 IL App (1st) 242195

No. 1-24-2195

Opinion filed June 22, 2026

FIRST DIVISION

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| DIANE WICKERSHEIM, as Guardian of DAVID KOZLOWSKI, a Disabled Person, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| RICHARD BRODERICK, M.D., ADVOCATE HEALTH AND HOSPITALS CORPORATION, ADVOCATE HEALTH PARTNERS, ADVOCATE HEALTH CARE NETWORK, ADVOCATE SHERMAN HOSPITAL, ADVOCATE SHERMAN PHYSICIAN PARTNERS, ADVOCATE AURORA HEALTH, INC., PRANAVKUMAR SHROFF, M.D., NORTHWEST HEALTHCARE ASSOCIATES, NORTHWEST HEALTH CARE ASSOCIATES, DUPAGE MEDICAL GROUP, LTD., MIDWEST PHYSICIAN ADMINISTRATIVE SERVICES, LLC, AJAY MEHTA, M.D., NORTHWEST SUBURBAN IMAGING ASSOCIATES, S.C., INTEGRATED IMAGING CONSULTANTS, LLC, GREGG COGNAC, PA-C, APIWAT FORD, D.O., NORTHERN ILLINOIS MEDICAL CENTER, NORTHWESTERN MEMORIAL HEALTHCARE, NORTHWESTERN MEMORIAL PHYSICIANS GROUP, NORTHWESTERN MEDICAL FACULTY FOUNDATION, NORTHWESTERN MEDICINE PHYSICIAN NETWORK, LLC, CENTRAL DUPAGE PHYSICIAN GROUP, JESSICA WALLACE, SILVIA YUNG, PA-C, SARAH KINGLSEY, R.N., LORI JAYNE SLOBODNIK, R.N., ELISE CHEWNING, R.N., SAMIR PATEL, M.D., and JACOB SALMAN, M.D., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County<br><br>No. 22 L 7929<br><br>The Honorable Michael F. Otto, Judge Presiding. |
| Defendants | ) | |

No. 1-24-2195

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.

Justices Howse and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1　　This appeal arises from the trial court's order finding defendant Advocate Sherman Hospital (Sherman Hospital) in contempt and imposing a monetary penalty for refusing to produce 14 pages from its records for defendant Richard Broderick, M.D., and his physician assistant, defendant Sylvia Yung, PA-C (P.A. Yung), that it claims were integral to their credentialing decision process and therefore privileged under the Medical Studies Act (735 ILCS 5/8-2101 *et seq.* (West 2024)). We hold that the trial court did not err in concluding that Sherman Hospital failed to meet its burden of establishing that the pages at issue were privileged. However, we vacate the finding of civil contempt against Sherman Hospital and the imposition of the monetary penalty.

¶ 2　　　　　　　　　　　　　　　BACKGROUND

¶ 3　　The plaintiff filed the present action for medical negligence naming as defendants various hospitals, medical corporations, physicians, physician practice groups, physician assistants, nurses, and other individuals involved in the care and treatment of David Kozlowski from October 3, 2020, through November 10, 2020. In summary, the allegations of medical negligence involve the failure to timely diagnose and treat a subdural hemorrhage that he sustained in a car crash, along with a failure to treat an intracerebral hemorrhage that developed following an emergency burr hole craniotomy to decompress the subdural hemorrhage. Some of this treatment occurred at Sherman Hospital and involved medical professionals alleged to be its employees, agents, or apparent agents. These include, in addition to Dr. Broderick and P.A. Yung, defendants

- 2 -

Pranavkumar Shroff, M.D., Ajay Mehta, M.D., Samir Patel, M.D., and Jacob Salman, M.D.

¶ 4        During discovery, the plaintiff issued a request to Sherman Hospital to produce all records of the credentials, privileges, and scope of practice that it had granted to these six medical providers (as well as others) in effect at the time of treatment. After Sherman Hospital initially objected on relevancy grounds only, the trial court overruled its objection and ordered it to produce all non-privileged information from these six providers' credentialing files from 2018 through December 8, 2023, along with privilege logs for any records withheld.

¶ 5        Sherman Hospital eventually complied with this order by producing records totaling 2,051 pages (comprising 476 pages for Dr. Broderick, 338 pages for P.A. Yung, 202 pages for Dr. Shroff, 97 pages for Dr. Mehta, 253 pages for Dr. Patel, and 685 pages for Dr. Salman). Many of these pages included significant redactions. It also produced privilege logs by which it asserted, relevant here, that the Medical Studies Act was the basis for redacting or withholding information otherwise responsive to the plaintiff's request.

¶ 6        The plaintiff filed a motion directed at Sherman Hospital's redactions, arguing that neither the privilege logs nor the documents themselves substantiated Sherman Hospital's assertion of privilege under the Medical Studies Act. Sherman Hospital filed a response in which it took the position that the redacted documents and privilege logs were in fact sufficient to establish that the privilege applied. It alternatively requested that the trial court conduct an *in camera* review of the documents as to which it was claiming a privilege prior to ruling on the plaintiff's motion. No affidavits were filed in conjunction with Sherman Hospital's response brief or otherwise.

¶ 7        At the hearing on the motion, the trial court agreed to conduct an *in camera* inspection of the documents withheld, but it confirmed that it would be doing so without the benefit of any affidavits from Sherman Hospital. Citing the case of *Mnookin v. Northwest Community Hospital*, 2018 IL

App (1st) 171107, ¶ 23, the trial court recognized that there was authority from this court that submitting documents for *in camera* review was an acceptable alternative to submitting affidavits for purposes of sustaining a claim of privilege under the Medical Studies Act. The trial court went on to state that without affidavits, it could make its determination based only upon "the face of the documents, but it is not impossible that some or perhaps all of the documents on their face make it so clear to the Court that these are documents protected by the Medical Studies Act and *** that the redactions are appropriate."

¶ 8        On August 16, 2024, the trial court issued the ruling that forms the basis of this appeal. It began its remarks by confirming that Sherman Hospital, "rather than provide me with an affidavit, tendered me over 2,000 pages of materials and asked me to figure out what was protected by the Medical Studies Act and what was not with zero guidance other than the face of the documents." The court went on to state that, "given that I did not have any affidavits or anything other than the face of the documents to go on, what I did was I looked at every single page of every single PDF that Advocate Sherman was kind enough to provide me." It then recited the page numbers of the files for each respective medical provider that it found from its review warranted sustaining an objection under the Medical Studies Act. This included 302 pages from Dr. Broderick's file as to which it sustained the claim of privilege, 286 pages from P.A. Yung's file, 136 pages from Dr. Shroff's file, 55 pages from Dr. Mehta's file, 152 pages from Dr. Patel's file, and 545 pages from Dr. Salman's file. The trial court concluded its ruling by stating:

> "I will note that it is possible that other pages within the various PDFs could have been part of the credentialing process. However, the documents were not clearly so on their face. Sometimes it was unclear to me who the individuals involved were; sometimes it was unclear to me what committee may have generated material; sometimes I concluded that even though

materials may have been collected as part of the process, they may have been generated earlier. In any event there was no sufficient showing that the materials were part of the credentialing process on the face of the documents, which again, is all I had to go on.

I attempted to be fair and considered documents in the context in which I found them so that, for example, if a document were immediately following an application for privileges and it reasonably appeared that it was submitted as part of the credentialing process, I would so consider it even though on the face of the individual document considered in a vacuum, that may not have been apparent. That is going to be the ruling."

¶ 9 On August 16, 2024, Sherman Hospital filed a motion for clarification of the trial court's above ruling. It argued that there were instances in which the trial court had ruled inconsistently as to whether certain standardized forms or types of information were privileged. It asserted that the trial court had incorrectly failed to find that the privilege applied to 19 pages of P.A. Yung's file, 6 pages of Dr. Broderick's file, 2 pages of Dr. Mehta's file, and 6 pages of Dr. Salman's file.

¶ 10 Relevant to this appeal, Sherman Hospital identified the following pages of P.A. Yung's file as being the subject of inconsistent and incorrect privilege rulings by the trial court. It argued that pages 393-394, titled "Ongoing Progressional Practice Evaluation Form" dated September 30, 2019, and page 414, titled "Professional Practice Report" dated September 14, 2022, were the same types of forms found to contain privileged information within the files of four of the physicians. It argued that pages 395-397 and 415-417 contained the department chair recommendations as to P.A. Yung's requests for privileges and were the same types of form ruled as privileged for different dates. It argued that pages 402-403, titled "Health Professional Peer Evaluation Form" dated April 23, 2019, contained the same type of information found privileged on two other pages of her file and in the file of Dr. Broderick. And it argued that pages 412-413,

titled "Scorecard: SHER Surgery—Physician Assistant" dated January 1, 2022, through June 30, 2022, was the same type of form found privileged within the files of Drs. Broderick and Shroff.

¶ 11    It also identified two pages from P.A. Yung's file (pages 405 and 411) and one page from Dr. Broderick's file (page 415) that were forms titled "MSO—Reappointments." It asserted that these were the same type of document that the trial court found privileged at a different place within Dr. Broderick's file and within Dr. Salman's file. Its argument was that these documents "contain quality indicators which are collected for the purpose of granting staff privileges and are privileged under the [Medical Studies Act]."

¶ 12    The motion for clarification was heard by the trial court on September 17, 2024. The written order from that date states only that the motion for clarification was denied. No transcript from that court hearing is included within the record on appeal.

¶ 13    On October 2, 2024, Sherman Hospital filed a motion for reconsideration of the order of August 16, 2024, or in the alternative for an order holding it in "friendly" civil contempt. Its arguments in the motion for reconsideration were materially the same as its arguments in the earlier motion for clarification, which it incorporated by reference, and it requested the trial court reconsider its ruling that the Medical Studies Act privilege did not apply to these pages.

¶ 14    The motion for reconsideration was heard by the trial court on October 24, 2024. The trial court granted it in part, as to several pages from the files of Drs. Broderick and Metha not relevant to this appeal. The trial court denied the remainder of the motion. In ruling, the trial court stated that it "did go back and look in an attempt to be as fully fair to Advocate Sherman as I could, and I did not see anything in the original briefing or, for that matter, in the privilege log which noted that these documents were the same." It again emphasized that Sherman Hospital had not provided it with an affidavit or even a summary of what the abbreviations in its privilege log meant, stating:

"The Court was invited to wing it on its own, and the Court did so to the best of its ability. Acknowledging the importance of the [Medical Studies Act] and attempting to be fair, I tried to consider in context if, for example, a page was found which did not on its face seem to be subject to the privilege but was contained within the context of other pages which did show on their face that they had been generated by or provided to the credentialing committee, I thought in fairness it was reasonable to conclude that a page within the same range might have been generated for the same purpose."

¶ 15    As for Sherman Hospital's request that it be held in friendly civil contempt, the trial court first ordered it to turn over to the plaintiff the pages that it argued were privileged and confirmed that it was refusing to comply with that order. The trial court thus found Sherman Hospital in civil contempt but stated that it was "not going to make it friendly." The trial court stated that it had "learned its lesson with a previous finding of friendly contempt in this case, which resulted in something of a procedural cluster bomb." That comment was apparently in reference to a separate instance in this same case wherein the court entered an order of friendly contempt against a codefendant, Gregg Cognac, PA-C, and fined him $10 per day for the intended purpose of enabling interlocutory review of a separate ruling involving the Medical Studies Act. However, P.A. Cognac thereafter did not pursue an appeal within the time for doing so but instead allowed the contempt order to become final. His counsel later stated to the trial court that he viewed paying $10 per day in perpetuity without producing the document at issue to be a more palatable option than taking an appeal. The trial court later reversed its own ruling as to the privilege at issue there, but the contempt order and fine remained in effect.

¶ 16    Thus, emphasizing that its intent was to compel Sherman Hospital to comply with its orders, the trial court imposed a fine on Sherman Hospital of $1,000 per day per page withheld. The fine

was to double automatically every 14 days but would not exceed a maximum of $128,000 per page.[1] The court stated that any fine beyond that could be viewed as punitive, which was not the court's intent. The trial court also stated that, in the event of an appeal, it would urge the appellate court to clarify whether it intended, by its statement in *Mnookin* and other cases to the effect that a party can substantiate its burden on a claim of privilege under the Medical Studies Act by tendering documents for *in camera* review, that a party could tender thousands of pages to the trial court without an affidavit "with nothing really to substantiate the privilege other than to put the onus on the Court to review all of the documents itself." The trial court stated that it was "hard-pressed to believe" that this was what the appellate court intended, and it urged the appellate court to use this appeal "to clarify the appropriate procedure for viewing the claim of privilege under the Medical Studies Act so that the situation, if it is not what they intended, is not repeated by Circuit Courts in good faith attempting to interpret and apply the opinions of the Appellate Court."

¶ 17                                      ANALYSIS

¶ 18        On appeal, Sherman Hospital reasserts its arguments that the pages and documents set forth in paragraphs 10-11 above are all privileged from disclosure under the Medical Studies Act, except that it no longer pursues this argument with respect to pages 395 and 415 of P.A. Yung's file. With respect to the remaining documents, which comprise 14 pages, Sherman Hospital argues that each demonstrates by its content that it served an integral function in the credential decision-making process and is privileged for that reason. It makes a slightly more expanded argument specific to the forms titled "MSO—Reappointments."

¶ 19        In pertinent part, the Medical Studies Act provides as follows:

_____

[1] The trial court stated in oral ruling that the maximum fine was to be "$128,000 per page per day," while the written order states that the "maximum fine per page is $128,000."

"All information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of *** committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, or their designees (but not the medical records pertaining to the patient), used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges or agreements for services ***." 735 ILCS 5/8-2101 (West 2024).

It further provides that "[s]uch information, records, reports, statements, notes, memoranda, or other data, shall not be admissible as evidence, nor discoverable in any action of any kind in any court." *Id.* § 8-2102.

¶ 20 Although the term is not used in the statute, the case law has long described this as a "peer-review privilege" applicable to information of "peer-review committees." See *Jenkins v. Wu*, 102 Ill. 2d 468, 480 (1984); *Richter v. Diamond*, 108 Ill. 2d 265, 269 (1985). Its recognized purpose is to ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care. *Roach v. Springfield Clinic*, 157 Ill. 2d 29, 40 (1993). It is premised upon the belief that, "absent the statutory peer-review privilege, physicians would be reluctant to sit on peer-review committees and engage in frank evaluations of their colleagues." *Id.* (citing *Richter*, 108 Ill. 2d at 269, and *Jenkins*, 102 Ill. 2d at 480). In

furtherance of that purpose, the Medical Studies Act makes privileged the information of certain specific types of committees or their designees capable of engaging in medical peer review and evaluating patient care. See *Pietro v. Marriott Senior Living Services, Inc.*, 348 Ill. App. 3d 541, 548-49 (2004).

¶ 21　　For the privilege to attach, the committee or its designee must be engaged in the peer-review process at the time information is generated. *Webb v. Mount Sinai Hospital & Medical Center of Chicago, Inc.*, 347 Ill. App. 3d 817, 825 (2004). In other words, information generated before a peer-review process begins or after it ends is not privileged. *Id.* Also, a document created in the ordinary course of a hospital's medical business or for legal, risk management, or corrective purposes is not privileged, even if it is later used by a committee in the process of peer review. *Id.* However, any information that is " 'initiated, created, prepared, or generated' " by a committee engaged in peer review is privileged, even if that information is later disseminated outside the peer-review process. *Id.* (quoting *Chicago Trust Co. v. Cook County Hospital*, 298 Ill. App. 3d 396, 406 (1998)); accord *Nielson v. SwedishAmerican Hospital*, 2017 IL App (2d) 160743, ¶ 36. But this does not include the "results" of the peer-review process, meaning the ultimate decision made or action taken by the committee or the hospital, as these are outside the scope of the privilege. *Ardisana v. Northwest Community Hospital, Inc.*, 342 Ill. App. 3d 741, 747 (2003). The appellate court has thus summarized that the privilege is limited to "the mechanisms of the peer-review process—*i.e.*, information initiated, created, prepared or generated by a peer-review committee, including information gathering and deliberation leading to the committee's ultimate decision." *Berry v. West Suburban Hospital Medical Center*, 338 Ill. App. 3d 49, 55 (2003).

¶ 22　　The burden of establishing the applicability of the privilege rests with the party seeking to invoke it. *Roach*, 157 Ill. 2d at 41. Whether the privilege applies is generally a matter of law

reviewed *de novo*, but the question of whether specific information was part of the peer-review process under the Medical Studies Act is a factual question within that legal determination and will not be reversed on review unless it is against the manifest weight of the evidence. *Pietro*, 348 Ill. App. 3d at 549. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 23    As stated above, Sherman Hospital argues on appeal that the Medical Studies Act privilege applies to the 14 pages it withheld from disclosure because the documents "established by their content they 'served an integral function in the peer-review and credentialing information-gathering and decision-making process' " that resulted in the appointment and reappointment of P.A. Yung and Dr. Broderick to Sherman Hospital's medical staff. It relies primarily on the case of *Toth v. Jensen*, 272 Ill. App. 3d 382 (1995), and a later statement citing *Toth* made by this court in *Ardisana*, 342 Ill. App. 3d at 748.

¶ 24    In *Toth*, this court was reviewing a trial court's determination, following an *in camera* inspection of six documents, that the documents were not privileged under the Medical Studies Act because they were prepared by individuals and were not the information of a peer-review committee. *Toth*, 272 Ill. App. 3d at 385. The defendant argued on appeal that these documents—four evaluations of the defendant physician and/or his staff privileges signed by the chairman of the hospital's department of surgery, one evaluation of the physician completed by another physician, and a memorandum to the chairman of the credentials committee from the chairman of the surgery department—were used by peer-review committees to make final personnel decisions at the hospital and were thus statutorily protected from disclosure. *Id.* This court noted that the record showed that committees existed within the hospital that engaged in internal quality control

and made decisions concerning the defendant's annual reappointment to the medical staff and his surgical privileges based upon the content of the documents at issue. *Id.* at 385-86. After reviewing the six documents under seal, this court found that they "served an integral function in the decision-making process" concerning the ultimate decisions about the defendant's reappointment and privileges, so as to be protected from disclosure by the Medical Studies Act. *Id.* at 386.

¶ 25    In *Ardisana*, this court was reviewing a trial court's denial of a privilege claim as to certain documents, which was based in part upon the fact that the defendant's affidavits in the case failed to show that the documents in dispute were generated at a time when the peer-review process was ongoing. *Ardisana*, 342 Ill. App. 3d at 748. This court stated that it had reviewed the documents at issue under seal and found, notwithstanding the lack of dates in the affidavits, that the privilege applied "because each of the documents establishes, by its own content, that it served an integral function in the peer-review information-gathering and decision-making process." *Id.* (citing *Toth*, 272 Ill. App. 3d at 386).[2] We stated that some of the documents at issue "self-evidently constitute 'investigate and deliberative materials generated by a hospital committee in formulating its recommendations.' " *Id.* at 749 (quoting *Green v. Lake Forest Hospital*, 335 Ill. App. 3d 134, 138 (2002)). We found as to others that it was "equally clear from their content that they were authored for the use of a peer-review committee and are thus entitled to protection from disclosure." *Id.*

¶ 26    Sherman Hospital argues that, as in the above cases, each of the various documents from P.A. Yung's file also demonstrates by its own content that it "served an integral function in the decision-making process" with respect to the issuance or reissuance of medical privileges to her. First, it

_____

[2] Sherman Hospital points out that we also reiterated this quote from *Ardisana* in *Mnookin*, 2018 IL App (1st) 171107, ¶ 26. However, the court in *Mnookin* was expressly relying on two detailed affidavits when it stated that the documents before it "served an integral function in the peer review information-gathering and decision-making process," and thus it did not find applicability of the privilege to have been established based upon the content of the documents alone. *Id.* ¶¶ 27-30.

asserts that pages 393-394, titled "Ongoing Professional Practice Evaluation Form" and dated September 30, 2019, bear the signature of the chief of the department of surgery evaluating of her competency in various general areas. Second, it asserts pages 396-397 and 416-417 contain the signature and recommendations of her department chair as to the privileges she requested in 2019 and 2022, respectively. Third, it asserts that page 414, titled "Professional Practice Report" and dated September 14, 2022, is likewise signed by the department chair and documents concerns about her performance as a neurosurgery physician assistant during the relevant period. Fourth, it asserts that pages 402-403, both titled "Health Professional Evaluation Form" and dated April 23, 2019, are completed and signed by other certified physician assistant peer reviewers who evaluated various categories of her knowledge and skill and stated whether they recommended her for reappointment. Fifth, it asserts that pages 412-413, titled "Scorecard: SHER Surgery—Physician Assistant" and dated January 1, 2022, to June 30, 2022, assign certain percentages or scores to various categories of her performance and show by various legends whether she was meeting her target goals. As to each of these documents, Sherman Hospital also emphasizes that they are similar to other department chair recommendations or peer reviewer analyses that the trial court found privileged within other providers' files or at other places within P.A. Yung's own file.

¶ 27    It makes a related but more specific argument as to the three documents titled "MSO—Reappointments" within the files of Dr. Broderick (page 415) and P.A. Yung (pages 405 and 411). It asserts that these forms document the number of neurosurgical procedures that were performed or participated in during the relevant timeframes listed. It further asserts that these forms comport with the delineation of privileges for the respective providers, *i.e.*, that Dr. Broderick demonstrate he had performed at least 50 neurological surgical procedures in the 12 months prior to his application for privileges and that P.A. Yung demonstrate that she provided services representative

of the scope and complexity of the privileges requested with respect to certain timeframes. It thus again argues that these MSO—Reappointments forms "necessarily 'served an integral function' in the credentialing decision-making process." It goes on to cite the context in which these MSO—Reappointment forms appeared in the respective provider's file. Specifically, it points out that Dr. Broderick's form on page 415 of his file was immediately followed by his "scorecard" on pages 416-419, which the trial court found to be privileged. And P.A. Yung's form on page 411 of her file was immediately followed by her scorecard (pages 412-413) and professional practice report (page 414), which should also have been found privileged but were not. Sherman Hospital also points out that other forms titled "MSO—Reappointments" were found privileged within Dr. Broderick's files and within the files of Drs. Salman and Shroff. Finally, it argues that disclosure of the MSO—Reappointments forms would improperly reveal the credentialing committees' internal review process, thereby further warranting application of the privilege.

¶ 28        We reject Sherman Hospital's arguments that the trial court erred by not finding that the Medical Studies Act privilege applied to these 14 pages of documents. In doing so, we remain mindful of the point repeatedly made by the trial court that Sherman Hospital chose to have it conduct an *in camera* review of over 2,000 pages of documents without providing any affidavit to assist the trial court's factual understanding of what these documents were and whether they qualified as information of a committee engaged in peer review. The crux of the trial court's ruling was its recognition that there were additional pages within those it had reviewed that "could have been part of the credentialing process" but "were not clearly so on their face." The trial court explained that it was sometimes unclear from the face of a particular document "who the individuals involved were" or "what committee may have generated material." In some instances, the trial court concluded that although materials may have been collected as part of the

credentialing process, "they may have been generated earlier." In summary, it found as to certain documents that "there was no sufficient showing that the materials were part of the credentialing process on the face of the documents, which again, is all I had to go on."

¶ 29        This factual determination by the trial court was not against the manifest weight of the evidence. We have reviewed the 14 pages as to which Sherman Hospital claims the trial court ruled incorrectly, and we find that it was not unreasonable, arbitrary, or without a basis in evidence to conclude that these pages suffer from the shortcomings identified by the trial court. Nothing on the face of any of page identifies clearly to us that it was "initiated, created, prepared, or generated" by a committee engaged in the peer review process.

¶ 30        The most persuasive aspect of Sherman Hospital's argument, in our view, is that some of the pages at issue on appeal appear to be the same types of standardized forms found privileged in other instances within the 2,000 pages reviewed by the trial court. In finding no error by the trial court, however, we are again mindful that this argument concerning the similarity of these forms was only raised in a motion for reconsideration, and the trial court emphasized in ruling that, upon looking back, it found nothing in the original briefing or privilege log identifying these documents as the same. In other words, it was adhering to its prior factual determination set forth above that these documents were among those as to which Sherman Hospital had not made a sufficient showing that they were information of a committee involved in the credentialing process. It is generally within the trial court's discretion whether to reconsider a prior factual determination. See *Toushin v. Ruggiero*, 2021 IL App (1st) 192171, ¶ 110. Where a motion for reconsideration is directed at factual determinations, we will not find abuse of discretion unless the factual findings as to which the trial court decided to adhere are against the manifest weight of the evidence. *Id.* Here, for the reasons discussed above, the trial court's factual determination that Sherman Hospital

had not met its burden of showing that these documents qualified as information of a committee engaged in the peer review process was not against the manifest weight of the evidence.

¶ 31    We further emphasize the trial court's following point, in denying reconsideration as to these documents, that it had considered the documents in the context of other pages around them that showed on their face that they had been generated by or provided to a credentialing committee. This signifies to us that the trial court was in a better position than this court to make factual determinations about these documents based upon their context, because the documents at issue are not presented to us in the same context in which they were presented to the trial court. The 14 pages at issue in this appeal are supplied to us as the first 14 pages of the confidential common law record. It is evident that this is not how they were considered by the trial court. For example, the confidential common law record for P.A. Yung's file includes only pages numbered 16-24, 40-41, 72-248, and 256-356, along with the disputed pages of 393-394, 396-397, 402-403, 405, and 411-417. For purposes of the context in which the trial court considered the disputed pages, all that we can discern is that they were separated from other privileged documents by at least 37 pages that the trial court ruled nonprivileged as to which no challenge is raised on appeal. We do not know the content of the 37 pages that came before them, 11 pages in the middle of them, or whether any other pages came after them. Thus, even more so than the trial court, we are literally limited to looking at the face of these documents, and we find nothing on them showing that they are information of a committee engaged in peer review. This further supports our conclusion that the trial court's finding was not against the manifest weight of the evidence.

¶ 32    We additionally point out that Sherman Hospital is making an under-inclusive legal argument here by arguing that the privilege applies because these documents "served an integral function" in the peer-review information-gathering and decision-making process. This argument fails

confront the basis for the trial court's ruling, which was that Sherman Hospital made an insufficient showing that these documents were initiated or generated by a committee engaged in peer review. Although not cited by Sherman Hospital, both *Toth* and *Ardisana* made this distinction. In *Toth*, this court's full statement was that "the Medical Studies Act protects documents *which arise from the workings of a peer-review committee* [citation] *and* which are an integral part, but not the result, of the peer-review process." (Emphasis added.) *Toth*, 272 Ill. App. 3d at 385. In *Ardisana*, this court set forth this standard in essentially identical language. *Ardisana*, 342 Ill. App. 3d at 746-47. And while Sherman Hospital only cites this court's statement in *Ardisana* that the documents reviewed under seal demonstrated by their content that they served an integral function in the peer-review information-gathering and decision-making process, our immediate next sentence was a finding that they also "self-evidently constitute 'investigative and deliberative material *generated by a hospital committee* in formulating its recommendations.' " (Emphasis added.) *Id.* at 748-49. In other words, it is not enough that information "serve an integral function" in the peer-review process. To be privileged, it must also be information "initiated, created, prepared, or generated" by a committee engaged in the peer review process. These are not synonymous concepts, and it is the latter that the trial court found was not established with respect to the documents at issue in this case.

¶ 33   We turn now to the issue closely related to the claim of error above as to which the trial court urged us to take the opportunity in this appeal to provide clarification. This concerns the statement found in several of this court's cases that a party invoking the Medical Studies Act may meet its burden of establishing that the privilege applies "by submitting the materials alleged to be privileged for an *in camera* inspection, or by submitting affidavits setting forth facts sufficient to establish the applicability of the privilege to the particular documents being withheld." *Mnookin*,

2018 IL App (1st) 171107, ¶ 23; accord *Nielson*, 2017 IL App (2d) 160743, ¶ 39; *Anderson v. Rush-Copley Medical Center, Inc.*, 385 Ill. App. 3d 167, 174 (2008); *Ardisana*, 342 Ill. App. 3d at 748. It is clear from the comments of the trial court below that it felt compelled to conduct the *in camera* privilege review of over 2,000 pages in this case without an affidavit because of our statement of this rule in *Mnookin* and other cases. It urged us to clarify for trial courts and litigants whether this is the procedure we intended to authorize by stating the rule as we have done. We note that this is not the first instance of a trial judge expressing frustration at a defendant's reliance on this rule as a basis for submitting hundreds of pages of documents claimed to be privileged without providing an affidavit to guide the court's *in camera* privilege review. See *Cornejo v. Mercy Hospital & Medical Center*, No. 12 C 1675, 2014 WL 4817806, *3-4 (N.D. Ill. Sept. 15, 2014).

¶ 34        We can trace the origin of the above statement to *Ekstrom v. Temple*, 197 Ill. App. 3d 120 (1990), where defendants asserted claims of privilege, including under the Medical Studies Act, without providing any specific information regarding the content or nature of most of the documents being withheld. The court set forth the rule that the party invoking a privilege has the burden of showing the facts that will give rise to the privilege, and a mere assertion that matter is privileged will not suffice. *Id.* at 127. It then stated, "We believe that contemnors should have supported the claim of privilege either by submitting the purportedly privileged materials for *in camera* inspection or by submitting affidavits setting forth facts sufficient to establish the applicability of the privilege to particular documents being withheld." *Id.*

¶ 35        This principle from *Ekstrom* was later cited in *Ardisana*, where we stated, "Claims of privilege may be supported either by submitting the purportedly privileged materials for *in camera* inspection or by submitting affidavits setting forth facts sufficient to establish the

applicability of the privilege to the particular documents being withheld." *Ardisana*, 342 Ill. App. 3d at 748 (citing *Ekstrom*, 197 Ill. App. 3d at 127). This was an appropriate point to make in *Ardisana*, because one basis for the trial court's denial of the claim of privilege was that an affidavit filed in that case failed to establish the dates upon which the peer review process commenced and ended. *Id.* Noting that the trial court had not required that any affidavits be filed to aid in its *in camera* review, we were critical of the trial court for thereafter relying upon a deficiency in the affidavit and declining to consider supplemental affidavits purporting to identify the start and end dates. *Id.* We further held that even if the supplemental affidavits remained deficient in establishing the start and end dates for the peer-review process, each of the six documents reviewed *in camera* nevertheless established "by its own content" that it served a function in the peer-review process; the documents either "self-evidently constitute[d]" materials generated by a committee in formulating its recommendations or otherwise made "clear from their content that they were authored for the use of a peer review committee." *Id.* at 748-49.

¶ 36    This rule, as we first stated it in *Ardisana*, has subsequently been repeated in several published opinions. See, *e.g.*, *Anderson*, 385 Ill. App. 3d at 174; *Nielson*, 2017 IL App (2d) 160743, ¶ 39; *Mnookin*, 2018 IL App (1st) 171107, ¶ 23. However, it appears that in each case where this rule was restated, multiple affidavits were in fact filed, and the *in camera* review at issue involved a relatively small number of documents compared to the case now before us. *Anderson* appears to have involved an *in camera* review of 33 documents supported by affidavits from a hospital's risk manager and its director of legal affairs. *Anderson*, 385 Ill. App. 3d at 169-72. *Nielson* appears to have involved an *in camera* review of three quality control reports that was supported by affidavits from the reports' authors and the hospital's director of risk management. *Nielson*, 2017 IL App (2d) 160743, ¶¶ 6-11, 22. And *Mnookin* appears to have involved an

*in camera* review of 24 documents supported by affidavits from 4 individuals. *Mnookin*, 2018 IL App (1st) 171107, ¶¶ 1, 7-13.

¶ 37    In summary, we find no indication in any of these cases that the appellate court has intended to authorize a procedure whereby the trial court is placed in the position of conducting an *in camera* privilege review of hundreds or thousands of pages of documents without receiving affidavits to establish the facts necessary to show that the information under review is within the scope of the Medical Studies Act privilege. A trial court faced with inadequate factual support for a claim of privilege acts properly either by requiring that all necessary affidavits be filed or by overruling the assertion of privilege for lack of substantiation by the party invoking it.

¶ 38    Finally, we address Sherman Hospital's argument that, notwithstanding our affirmance of the trial court's ruling on its privilege claim, the contempt order and monetary penalty must nevertheless be vacated because this appeal was taken in good faith. The plaintiff makes no argument against vacating the contempt order or the fine as to Sherman Hospital. Instead, however, the plaintiff urges us to use this issue as a vehicle for providing instructions or guidance about the separate situation in which codefendant Cognac apparently obtained an order of "friendly" contempt but decided to simply pay the nominal fine in perpetuity instead of appealing the adverse discovery order or turning over the document. It would clearly be inappropriate and outside the scope of our jurisdiction to address any ruling involving Cognac. We have jurisdiction over the present appeal under Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016), which authorizes our review of "[a]n order finding a person or entity in contempt of court which imposes a monetary or other penalty." Our jurisdiction under this rule is limited to reviewing the contempt order entered against Sherman Hospital and the underlying ruling that gave rise to that contempt order against Sherman Hospital. *Shamrock Chicago Corp. v. Wroblewski*, 2019 IL App (1st) 182354, ¶ 19.

¶ 39        Concerning the contempt order and monetary penalty against Sherman Hospital, we agree that these must be vacated. It is an appropriate procedure for a party to request that a contempt order be entered against it so that it may seek immediate appeal of a trial court's discovery order. *Less v. Mercy Hospital & Medical Center*, 2022 IL App (1st) 220247, ¶ 38. In such instances, where the party sought the order in good faith and was not contemptuous of the trial court's authority, we may vacate the contempt order even when we find that the trial court's discovery ruling was proper. *Id.* We find this to be such a case. Accordingly, we vacate that portion of the order of October 21, 2024, finding Sherman Hospital in civil contempt and imposing a monetary penalty upon it.

¶ 40                                    CONCLUSION

¶ 41        The trial court's order overruling defendant Advocate Sherman Hospital's claims of privilege as to the 14 pages of documents at issue in this appeal and ordering that they be produced to the plaintiff, as well as its order denying the motion to reconsider that ruling, are affirmed. That portion of the order of October 21, 2024, finding defendant Advocate Sherman Hospital in civil contempt and imposing a monetary penalty upon it is vacated.

¶ 42        Affirmed in part and vacated in part.

### _Wickersheim v. Broderick_, 2026 IL App (1st) 242195

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-L-7929; the Hon. Michael F. Otto, Judge presiding. |
| **Attorneys for Appellant:** | Benjamin E. Patterson, Hugh C. Griffin, Molly E. Pankauskas, Madeline Engledow, and Samuel C. Schwab, of Hall Prangle & Schoonveld, LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Michael M. Viglione and Philip J. Ryan, of Ryan, Ryan & Viglione, of Waukegan, for appellee. |